UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JEFFREY ZINK, on behalf of himself and                          **DECISION AND ORDER**
all others similarly situated,

                              Plaintiff,                          13-CV-01076-JJM

v.

FIRST NIAGARA BANK, N.A.,

                              Defendant.
_____

         Plaintiff Jeffrey Zink commenced this action on July 19, 2013, seeking to recover class remedies from defendant First Niagara Bank, N.A. pursuant to New York's Real Property Law ("RPL") §275(1) and Real Property Actions and Proceedings Law ("RPAPL") §1921(1), for its allegedly "systematic failure to timely present to the county clerks of New York State proof that mortgages have been satisfied".  Complaint [1], ¶1; Amended Complaint [21], ¶1.

         Pursuant to 28 U.S.C. §636(c)(1) and Fed. R. Civ. P. ("Rule") 73, the parties have consented to proceed before me instead of a district judge [122].[1]  Familiarity with the relevant facts and lengthy procedural history of this case is presumed - in particular, my October 20, 2015 Report and Recommendation [94] recommending denial of plaintiff's previous motion for class certification and settlement approval (adopted by District Judge Richard J. Arcara on January 12, 2016 ([98], 155 F. Supp. 3d 297)), and my July 1, 2016 Decision and Order ([119], ___F. Supp.3d ___, 2016 WL 3950957) preliminarily certifying the class and approving the pending proposed  settlement .

_____

[1]      Bracketed references are to CM/ECF docket entries.

Before me is plaintiff's Uncontested Motion for Final Approval of Class Action Settlement pursuant to Rule 23 (the "Settlement Motion") [123], and his Uncontested Motion for Attorneys' Fees, Expenses, and Service Award Payment (the "Fee Motion") [126]. Under the proposed settlement, First Niagara has made available the sum of $2.2 million to pay class claims (Settlement Agreement and Release [101-3], §2.35), representing approximately 50% of the full value of those claims. Plaintiff's Memorandum of Law [124], p. 16 of 30. In addition, it has agreed not to contest an application for court approval for payment of a service award to plaintiff in an amount not to exceed to $5,000, and payment of attorney's fees and expenses to counsel in an amount not to exceed one-third of the $2.2 million made available to claimants, both amounts to be paid by First Niagara in addition to the $2.2 million made available to claimants. Settlement Agreement and Release [101-3], §5.04(a), (c). Any unclaimed portion of the $2.2 million reverts to First Niagara. Id., §5.01(c).

A fairness hearing was held before me on November 10, 2016 [131], attended by counsel for plaintiff and First Niagara. For the following reasons, the Settlement Motion is granted, and the Fee Motion is granted in part and denied in part.[2]

## ANALYSIS

### A.    Class Action Settlement

"[T]here is a strong judicial policy in favor of settlements, particularly in the class action context." McReynolds v. Richards-Cantave, 588 F.3d 790, 803 (2d Cir. 2009). However, "[Rule] 23(e)(2) provides that a court may approve a class action settlement only if it

---

[2]    I previously analyzed whether class certification was appropriate, and my only concern in that regard was adequacy of representation. October 20, 2015 Report and Recommendation [94], p. 10; 155 F. Supp.3d at 307. As discussed herein, while I have minor concerns as to counsel's performance, I conclude that their representation of the class has been sufficient to justify approval of the settlement.

is 'fair, reasonable, and adequate' . . . . The court must review the negotiating process leading up to the settlement for procedural fairness, to ensure that the settlement resulted from an arm's-length, good faith negotiation between experienced and skilled litigators . . . . The court must also evaluate substantive fairness." Charron v. Wiener, 731 F.3d 241, 247 (2d Cir. 2013).

### 1.      Procedural Fairness

Plaintiff and First Niagara were both represented by experienced and capable counsel, and the case was hard fought, including several substantive motions [12, 37, 70]. Moreover, the parties engaged in a lengthy session before JAMS Mediator David Geronemus. Blankinship Declaration [125], ¶7.  The "involvement of an experienced mediator is a strong indicator of procedural fairness".  Chambery v. Tuxedo Junction Inc., 2014 WL 3725157, *6 (W.D.N.Y. 2014) (Wolford, J.).  Therefore, I find that the process leading to the proposed settlement was procedurally fair.

### 2.      Substantive Fairness

In evaluating the substantive fairness of the settlement, the court must  consider "(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation." Charron, 731 F.3d at 247.

"Courts have wide discretion in assessing the weight and applicability of each factor.  The relative importance to be attached to any particular factor will depend on . . . the unique facts and circumstances of the case. "  5 Moore's Federal Practice, §23.164[1] (Matthew Bender 3d ed.).  While I have considered each of the factors mentioned in Charron, I give particular weight to factors 2 and 4.  *See* Raniere v. Citigroup Inc., 310 F.R.D. 211, 218 (S.D.N.Y. 2015) ("the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy"); In re Traffic Executive Association Eastern Railroads, 627 F.2d 631, 633 (2d Cir. 1980) ("the most significant factor for the district judge is the strength of plaintiffs' case balanced against the settlement offer").

With regard to factor 2, in this case "[a]ll 4,881 members of the class received notice, not a single class member objected, and only four class members opted out of the settlement . . . . Moreover, 43% of the class made a claim, an extraordinary claims rate that demonstrates that the Class views the Settlement favorably".  Plaintiff's Memorandum of Law [124], p. 8 of 30.  *See* Chambery, 2014 WL 3725157, *6 (noting that a 37% opt-in rate "is an unusually high participation rate for a 'claims made' settlement agreement . . . . 'Claims made' settlements regularly yield response rates of 10 percent or less").

With regard to factor 4, under the proposed settlement "[c]lass members stand to receive 50% of their potential recovery".  Plaintiff's Memorandum of Law [124], p. 26 of 30.  I believe that this figure is reasonable, particularly in view of the uncertainty regarding the existence of subject matter jurisdiction in light of  Spokeo, Inc. v. Robins, ___U.S.___, 136 S. Ct. 1540 (2016).  As I stated in granting preliminary approval of the proposed settlement, "[i]n my view, under the present state of the law the scales tip slightly (but only slightly) in favor of finding that plaintiff has Article III standing to pursue claims on behalf of himself and the class.

-4-

However, the substantial possibility that a higher court might eventually rule otherwise, particularly when coupled with the other defenses potentially available to First Niagara, warrants the settlement agreement's significant reduction from full value of the class members' claims." July 1, 2016 Decision and Order [119], p. 11 (2016 WL 3950957, *6).[3]

Since I issued that decision, some courts have agreed that subject matter jurisdiction exists in cases of this type. *See* Bellino v. JPMorgan Chase Bank, N.A., 2016 WL 5173392, *9 (S.D.N.Y.  2016) ("[t]he Supreme Court was clear in Spokeo that a concrete harm need not be tangible.  The statutes create a substantive right for Plaintiff to have the satisfaction of mortgage timely filed, and Defendant violated that right.  Nothing more is required, here, to demonstrate an injury-in-fact"); Jaffe v. Bank of America, N.A., 2016 WL 3944753, *4 (S.D.N.Y. 2016) ("[p]laintiffs have standing.  Therefore, this action will not be dismissed for lack of subject matter jurisdiction").

However, other courts have taken the opposite view.  *See* Nicklaw v. Citimortgage, Inc., 839 F.3d 998, 1003 (11th Cir. 2016) ("[b]y alleging only that CitiMortgage recorded the certificate late and nothing else, Nicklaw has failed to establish that he suffered or could suffer any harm that could constitute a concrete injury . . . . Nicklaw lacks standing to sue CitiMortgage"); Villanueva v. Wells Fargo Bank, N.A., 2016 WL 5220065, *6 (S.D.N.Y. 2016) ("as pled, Plaintiffs' claims in the instant actions fail to allege a concrete harm sufficient to support Article III standing"); Zia v. CitiMortgage, Inc., 2016 WL 5369316, *4 (S.D. Fla. 2016) ("Zia has not alleged a concrete harm sufficient to establish Article III standing").

---

[3]     While First Niagara has agreed not to contest standing at this time, it reserves the right to do so if the settlement is not approved.

In view of these conflicting opinions, the Second Circuit's guidance would be helpful.[4]  However, 28 U.S.C. §1292(b) allows for an interlocutory appeal only where the court certifies that there is "a controlling question of law as to which there is substantial ground for difference of opinion *and* that an immediate appeal from the order may materially advance the ultimate termination of the litigation" (emphasis added).  Thus, both conditions must be satisfied in order to appeal.  *See* <u>Koehler v. Bank of Bermuda Ltd.</u>, 101 F.3d 863, 865–66 (2d Cir. 1996) ("[t]he use of §1292(b) is reserved for those cases where an intermediate appeal may avoid protracted litigation"); <u>Westwood Pharmaceuticals, Inc. v. National Fuel Gas Distribution Corp.</u>, 964 F.2d 85, 88 (2d Cir. 1992) ("[a]lthough the issues raised on this appeal provide substantial ground for difference of opinion, and are controlling . . . it is not clear to us that our disposition of these issues will materially advance the ultimate determination of this case").

While the first condition is clearly satisfied, the second is not - for if I approve the settlement, the case is concluded.  Although an appeal would lie if I were to dismiss the action for lack of subject matter jurisdiction, for the reasons discussed in my July 1, 2016 Decision and Order [119] I continue to believe that "the scales tip slightly" in favor of concluding that this court has subject matter jurisdiction over the asserted claims, notwithstanding the contrary authority which I have cited. Therefore, I cannot in good conscience dismiss the action merely in order to obtain appellate review, for "when a federal court has jurisdiction, it also has a virtually unflagging obligation to exercise that authority".  <u>Mata v. Lynch</u>, ___U.S.___, 135 S. Ct. 2150, 2156 (2015).

---

[4]      In <u>Strubel v. Comenity Bank</u>, 842 F.3d 181 (2d Cir. 2016), decided on November 23, 2016, the Second Circuit analyzed claims for violation of the Truth in Lending Act (15 U.S.C. §§1601 *et seq*.) in light of <u>Spokeo</u>, holding that plaintiff had standing to assert some of the claims but not others.  However, I do not believe that <u>Strubel</u> furnishes meaningful guidance as to standing for the claims asserted here.

**B.      Service Award**

Counsel "requests that the Court approve the payment of a service award to Plaintiff in the amount of $5,000 in recognition of his efforts on behalf of the Class. Pursuant to the Settlement Agreement, First Niagara has agreed to pay this award using its own Resources, which means these payments will not reduce the benefits payed to the Class members".  Plaintiff's Memorandum of Law [127], p. 33 of 34.

As I stated at an earlier stage of this case, "[p]ayments to class representatives, while not foreclosed, should be closely scrutinized".  October 20, 2015 Report and Recommendation [94], p. 15, (*quoting* Ortiz v. Chop't Creative Salad Co. LLC, 2015 WL 778072, **3-4 (S.D.N.Y. 2015)).  "Although an 'incentive award' or 'service fee' to named plaintiffs in a class action is not uncommon, it must be justified by the facts. Courts look for the existence of special circumstances when determining whether an award is justified and, if so, in what amount . . . . 'Special circumstances' includes the risk undertaken by the plaintiff, the time and effort expended, and any unique added value provided to the litigation . . . . Where a proposed incentive award is inappropriate, courts have reduced them."  Berkson v. Gogo LLC, 2016 WL 1375803, *1 (E.D.N.Y. 2016).

"The party seeking approval of an incentive award bears the burden of proving that the proposed recipients, typically the class representatives, deserve an award and that the proposed level of the award is reasonable . . . . Accordingly, most courts require factual support for any proposed incentive award."  Newberg on Class Actions, §17:12 (5th ed.).  "For the court to approve the incentive awards - even if they are nominal, and even if the defendant does not object - there must be some evidence in the record demonstrating that the representative plaintiffs were involved.  Absent such evidence, the court lacks an adequate basis to approve the

incentive awards." In re Heartland Payment Systems, Inc. Customer Data Security Breach Litigation, 851 F. Supp. 2d 1040, 1090 (S.D. Tex. 2012).

"Typically, facts relevant to the incentive award determination are demonstrated in affidavits submitted by class counsel and/or the class representatives, through which these persons testify to the particular services performed, the risks encountered, and any other facts pertinent to the award." Newberg, §17:12. No such affidavits were submitted here. Although plaintiff's Memorandum of Law mentions various services allegedly performed by plaintiff ([127], p. 33 of 34), "[s]tatements by counsel in briefs are not evidence". SHL Imaging, Inc. v. Artisan House, Inc., 117 F. Supp. 2d 301, 315 n. 6 (S.D.N.Y. 2000).[5]

Counsel's time records [132] mention communications between plaintiff and his attorneys on June 25, July 2 and July 15, 2013 and on April 24, August 6, August 7 and October 21, 2014. However, in context of the entire history of this case, those sporadic communications (which are not described) do not appear to be substantial. Moreover, while plaintiff's deposition had been scheduled, counsel stated at oral argument that it was never held. Finally, the time records do not indicate whether plaintiff participated in the mediation.

"[T]he desire to incentivize lead plaintiff participation must be tempered by an equally important quest for parity and fairness among class members." In re AOL Time Warner ERISA Litigation, 2007 WL 3145111, *4 (S.D.N.Y. 2007). While plaintiff's cursorily documented efforts on behalf of the class are deserving of some recognition, they do not justify a service award in the amount requested. Instead, an award of $2,500 is appropriate. See Berkson, *1 ("[n]amed plaintiffs did not incur significant risk or expense in this litigation . . . . Plaintiffs did not incur significant personal risk in the way a plaintiff bringing employment-related claims

---

[5]       Plaintiff's Memorandum of Law refers to "Blankinship Dec. ¶ 24". [127], p. 33 of 34. However, there is no paragraph 24 in either of attorney Blankinship's Declarations [125, 128], nor does either Declaration elsewhere mention any services performed by plaintiff himself.

does. Service awards of $2,500 [rather than the $5,000 requested] to each of the three named

plaintiffs is approved for the time each of them devoted to the case").


**C.      Attorney's Fees/Expenses**

Counsel also seeks court approval for an award of "$733,333.00, or one third of

the $2,200,000 Settlement Fund . . . in attorney's fees and costs, which is separate and apart from

the benefit to be received by Class members".  Plaintiff's Memorandum of Law [127], p. 13 of

34.[6]  While no class members have objected to this request, "the absence of objections to an

agreed-upon attorney's fee award does not relieve the Court of its independent obligation to

assess the agreement for its overall fairness and reasonableness".  Davis v. J.P. Morgan Chase &

Co., 827 F. Supp. 2d 172, 183 (W.D.N.Y. 2011) (Larimer, J.).   "What constitutes a reasonable

fee is properly committed to the sound discretion of the district court . . . which is intimately

familiar with the nuances of the case."  Goldberger v. Integrated Resources, Inc., 209 F.3d 43,

47–48 (2d Cir. 2000).

First Niagara's agreement not to oppose counsel's fee request (Settlement

Agreement [101-3], §5.04(c)) is known as a "clear sailing" agreement.  Newberg, §13:9.  Such

an agreement "by its nature deprives the court of the advantages of the adversary process".

Weinberger v. Great Northern Nekoosa Corp., 925 F.2d 518, 525 (1st Cir. 1991).  "Courts worry

that such agreements are indicia of collusion between class counsel and the defendant, signaling

that perhaps class counsel agreed to a smaller class recovery in exchange for a heftier fee."

Newberg, §13:9.

---

[6]      This amount includes expenses totaling $41,261.57 (Blankinship Declaration [128], ¶21; [133]), which I find to be reasonable.

"However, not every clear sailing provision demonstrates collusion." Id.  "[A]n agreement not to oppose an application for fees up to a point is essential to completion of the settlement, because the defendants want to know their total maximum exposure and the plaintiffs do not want to be sandbagged." Malchman v. Davis, 761 F.2d 893, 905 n. 5 (2d Cir. 1985), abrogated on other grounds, Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997).  *See also* Blessing v. Sirius XM Radio Inc., 507 Fed. App'x. 1, 4 (2d Cir. 2012) ("[t]o the extent objectors argue that the clear-sailing and reversionary provisions suggest improper collusion between class counsel and Sirius XM, we note that such provisions, without more, do not provide grounds for vacating the fee").

"In determining a reasonable fee, the Court is free to rely on a percentage of recovery determination, and/or to employ the lodestar method (multiplying the attorneys' billable hours by their reasonable billable rate).  However, the recent trend in the Second Circuit has been to apply the percentage-of-recovery method and loosely use the lodestar method as a baseline or cross check." In re Eastman Kodak ERISA Litigation, 2016 WL 5746664, *2 (W.D.N.Y. 2016) (Larimer, J.).  "Factors relevant to a determination of the reasonable fee under both the lodestar and percentage of recovery methods include: (1) the time and labor expended by counsel; (2) the size and complexity of the matter; (3) the risks involved in the litigation; (4) the quality of representation; (5) the relationship between the requested fee and the settlement; and (6) considerations of public policy." Id.  I will consider each of these factors in deciding an appropriate fee award:

1.       **The Time and Labor Expended by Counsel**

Counsel claim to have devoted in excess of 1400 hours to this case (Blankinship

Declaration [128], ¶17), and have submitted detailed time records [132], which I have reviewed.

Given my familiarity with the procedural history of this case, that amount of time appears

reasonable.  *See* Torres v. Gristede's Operating Corp., 519 Fed. App'x. 1, 4 (2d Cir. 2013)

("[t]rial courts evaluating fee requests need not, and indeed should not, become green-eyeshade

accountants . . . . district courts may take into account their overall sense of a suit in estimating

compensable attorney time, which determinations are owed substantial deference"); Davis, 827

F. Supp. 2d at 184 ("[w]here the lodestar method is used as a mere cross-check, the hours

documented by counsel need not be exhaustively scrutinized by the district court.  Instead, the

reasonableness of the claimed lodestar can be tested by the court's familiarity with the case").


2.       **The Size and Complexity of the Matter**

This action involved a class of over 4800 members, and was one of the first (if not

the first) class actions seeking to enforce RPL §275(1) and RPAPL §1921(1).  Prior to the

settlement, the action was vigorously defended by First Niagara, which moved to dismiss on

several grounds, including federal preemption and lack of standing [37], which motion I denied.

*See* Amended Report and Recommendation [51], adopted by Judge Arcara [59] (18 F. Supp.3d

363).  Thereafter, First Niagara raised a second standing challenge in light of Spokeo.  *See* First

Niagara's Memorandum of Law [102], p. 5 of 8.

### 3.      The Risks Involved in the Litigation

"[T]he risk of success [is] perhaps the foremost factor to be considered in determining whether to award an enhancement." Goldberger, 209 F.3d at 54.  Given the various defenses asserted by First Niagara, including preemption and lack of subject matter jurisdiction, counsel had no guarantee of success.  In fact, counsel represented plaintiffs in at least three other actions (Nicklaw, Villanueva and Zia) involving the same statutes as those at issue here, which have been dismissed for lack of subject matter jurisdiction - meaning that counsel recovered nothing for their efforts in those cases.

### 4.      The Quality of Representation

Counsel have overall done a commendable job on behalf of the class.  However, in some respects they have demonstrated a lack of attention to detail, as discussed both in my Report and Recommendation [94] recommending denial of plaintiff's first motion for settlement approval, and elsewhere in this opinion - for example, in failing to properly document the basis for a service award to plaintiff (p. 8, *supra*), and in suggesting that Southern District, rather than Western District, billing rates should apply to the lodestar cross-check (p. 19, *infra*).

The fact that the motion is unopposed does not excuse this inattentiveness.  If anything, it makes my job in evaluating the settlement (and fee application) more difficult, because First Niagara has no incentive to point out any flaws in the application.  *See* Martin v. Cargill, Inc., 295 F.R.D. 380, 383–84 (D. Minn. 2013) ("[j]udicial review must be exacting and thorough.  The task is demanding because the adversariness of litigation is often lost after the agreement to settle").

### 5.      The Relationship Between the Requested Fee and the Settlement

Counsel argues that "it is appropriate to award attorneys' fees as a percentage of the entire maximum gross settlement fund, even where amounts to be paid to class members who do not file claims will revert to the Defendants".  Plaintiff's Memorandum of Law [127], p. 20 of 34.  Here, however, no fund has been created - instead, First Niagara has agreed to pay claims as they are asserted, up to a maximum of $2.2 million, which is known as a "claims-made settlement".  *See* Newberg, §13:7 ("[a] claims-made settlement is a settlement that does not have a fixed settlement fund, but rather provides that the defendant will pay claims of class members who file them, usually up to some fixed ceiling").

"[C]laims-made settlements complicate fee setting.  In a common fund case, counsel is typically entitled to a percentage of the fund. But in a claims-made settlement, courts are split on what to take a percentage of: the full amount available to the class or the smaller amount actually claimed by the class."  Id.  At an earlier stage of this case, I stated that "if the fee is to be calculated as a percentage of the settlement, the settlement should be valued on the basis of the number of claims that were made against it."  October 20, 2015 Report and Recommendation [94], p. 17 (155 F. Supp. 3d at 310), *quoting* Parker v. Time Warner Entertainment Co., L.P., 631 F. Supp.2d 242, 267 (E.D.N.Y.2009).  However, for the following reasons, I now believe that the weight of authority is to the contrary - and to quote Justice Jackson, "I see no reason why I should be consciously wrong today because I was unconsciously

wrong yesterday". <u>Commonwealth of Massachusetts v. United States</u>, 333 U.S. 611, 639-40

(1948) (dissenting opinion).[7]

In <u>Fears v. Wilhelmina Model Agency, Inc.</u>, 2005 WL 1041134, *4 (S.D.N.Y.

2005), involving a common fund, the district court recognized that courts in other circuits "have

held that attorneys' fees should be calculated as a percentage of the total fund", but concluded

that "decisions within this Circuit prohibit the allowance of attorneys' fees in an amount greater

than the sum actually claimed by the class."  However, on appeal, the Second Circuit reversed:

"In siding with courts that compute fees as a percentage of claims made, the District Court saw

the alternative procedure as creating a 'windfall' for the attorneys.  We disagree.  The entire

Fund, and not some portion thereof, is created through the efforts of counsel at the instigation of

the entire class.  An allocation of fees by percentage should therefore be awarded on the basis of

the total funds made available, whether claimed or not.  We side with the circuits that take this

approach." <u>Masters v. Wilhelmina Model Agency, Inc.</u>, 473 F.3d 423, 437 (2d Cir. 2007) (<i>citing</i>

<u>Waters v. International Precious Metals Corp.</u>, 190 F.3d 1291, 1295 (11th Cir.1999) <i>and</i>

<u>Williams v. MGM–Pathe Communications Co.</u>, 129 F.3d 1026, 1027 (9th Cir.1997)).[8]

Some courts have concluded that <u>Masters</u> is not applicable to a claims-made

settlement.  For example, in <u>Bodon v. Domino's Pizza, LLC</u>, 2015 WL 3889577 (E.D.N.Y.),

<u>adopted</u>, 2015 WL 3902405 (E.D.N.Y. 2015), the court reasoned that "the settlement in <u>Masters</u>

---

[7]      <i>See also</i> <u>Christianson v. Colt Industries Operating Corp.</u>, 486 U.S. 800, 817 (1988) ("A court has
the power to revisit prior decisions of its own . . . in any circumstance"); Rule 54(b) ("any order or other
decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of
fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all
the claims and all the parties' rights and liabilities").

[8]      <i>See also</i> <u>Alleyne v. Time Moving & Storage Inc.</u>, 264 F.R.D. 41, 59 (E.D.N.Y. 2010) ("the value
of legal service rendered in the creation of a settlement fund [is not] diminished by the failure of
beneficiaries to cash in, regardless of what happens to the surplus"); <u>Gascho v. Global Fitness Holdings,
LLC</u>, 822 F.3d 269, 285 (6th Cir. 2016) ("an option to file a claim creates a prospective value, even if the
option is never exercised").

bears no resemblance to the one in this case.  First, the <u>Masters</u> settlement set aside a specific,

fixed sum.  Here, the Court's settlement proposal, and the resulting agreement of the parties, did

not include either a fixed sum or minimum payment . . . .  Moreover, in <u>Masters</u> . . . the

defendants were not entitled to the [unclaimed] funds; rather, those funds would either be

distributed to charities that benefitted the class members, or allocated to class members as treble

damages.  Because the class members in <u>Masters</u> thus would receive the benefit of the *entire*

fund, plaintiffs' counsel were entitled to a percentage of the whole recovery.  The Second

Circuit's award of a percentage of the entire recovery in <u>Masters</u> does not, however, mean that

plaintiffs' counsel are entitled to a percentage of a *hypothetical* recovery."  2015 WL 3889577,

*5 (emphasis in original).

        In my view, this interpretation of <u>Masters</u> is unduly narrow.  In the first place,

although a claims-made settlement does not result in the creation of a separate fund, it has

repeatedly been recognized that such a settlement is "the functional equivalent of a common fund

settlement where the unclaimed funds revert to the defendant . . . . [T]he two are fully

synonymous".  <u>Newberg</u>, §13:7; <u>Poertner v. Gillette Co.</u>, 618 Fed. App'x. 624, 629 n. 2 (11th

Cir. 2015), <u>cert. denied</u>, ___U.S.___, 136 S. Ct. 1453 (2016).  "There is no meaningful

distinction between a fund with a reversion provision and a defendant-paid-claims process . . . .

In both cases, unclaimed funds wind up with the defendant."  <u>Gascho</u>, 822 F.3d at 286.

        Secondly, I do not believe that <u>Masters</u>' holding is limited to situations in which

the unclaimed funds do not revert to the defendant - for in both of the cases with which <u>Masters</u>

"side[d]" (473 F.3d at 437), the unclaimed funds *did* revert to the defendant.  *See* <u>Waters</u>, 190

F.3d at 1292 ("the stipulation provided that any money not claimed by the plaintiff class or used

to pay out fees and expenses would revert to defendant"); <u>Williams</u>, 129 F.3d at 1027 ("the

unclaimed money in the fund . . . will be returned to the defendants if it is not used to pay the

class attorneys' fees"). *See also* <u>Poertner</u>, 618 Fed. App'x. at 628, 629 n.2 ("attorneys' fees

awarded from a common fund shall be based upon a reasonable percentage of the fund

established for the benefit of the class . . . . While no published opinion of ours extends [the]

percentage-of-recovery rule to claims-made settlements, no principled reason counsels against

doing so").

   "When conducting a percentage of the fund analysis, courts must calculate the

ratio between attorney's fees and benefit to the class.  Attorney's fees are the numerator and the

denominator is the dollar amount of the Total Benefit to the class (which includes the benefit to

class members, the attorney's fees and may include costs of administration)." <u>Gascho</u>, 822 F.3d

at 282.  While it may seem curious to include separately-paid attorney's fees as a "benefit to the

class" when the class has no entitlement to them, the reason is that if the fees were not separately

paid, then they would be paid out of the amounts otherwise available to the class, thereby

diminishing the class recovery.  Therefore, even if indirectly, attorney's fees paid directly by the

defendant are a benefit to the class.  *See* <u>Newberg</u>, §15:56 ("[b]ecause there is no real common

fund in a claims-made settlement, fees in claims-made settlements are typically paid by the

defendant, not by the class out of the fund, in addition to the amounts paid to the class members.

All that said, in *calculating* those fees, a court may use the scope of the claims-made fund (or its

ceiling) as a valuation measure") (emphasis in original).

   Counsel's fee request "represents only 25 percent of the value of the aggregate

settlement amount (*i.e.*, the amount available to the Class plus attorney's fees)" (plaintiff's

Memorandum of Law [127], p. 9 of 34).[9]  That is considered a "benchmark" fee request.  *See*

---

[9] At oral argument, counsel stated that the actual payout to class members who submitted claims
will be $697,000.

Williams, 129 F.3d at 1027 ("our benchmark for an attorneys' fee award in a successful class

action is twenty-five percent of the entire common fund"); Poertner, 618 Fed. App'x. at 628 ("25

percent [is] the bench mark attorneys' fee award"); Newberg §1:18 ("[t]he plaintiffs' attorneys

typically receive around 25% of the gross recovery as their fee award"); Eastman Kodak, 2016

WL 5746664, *3 ("the Court will impose a modest across-the-board reduction . . . to 25% of the

common fund").


###### 6.   Considerations of Public Policy

"Consumer class actions . . . have value to society . . . both as deterrents to

unlawful behavior . . . and as private law enforcement regimes that free public sector resources.

If we are to encourage these positive societal effects, class counsel must be adequately

compensated." Gascho, 822 F.3d at 287.  "[I]n addition to providing just compensation, awards

of attorneys' fees . . . serve to encourage skilled counsel to represent those who seek redress for

damages inflicted on entire classes of persons, and to discourage future misconduct of a similar

nature." In re Telik, Inc. Securities Litigation, 576 F. Supp. 2d 570, 585 (S.D.N.Y. 2008).

"Whether or not to reward counsel with a percentage of a fund that never came

into being, or was never claimed and reverted back to the defendant, has divided courts and

commentators alike . . . . Those who believe the fee should be calculated according to the monies

*disbursed* point out that the reversionary portion of a fund is illusory."  Newberg, §15:70

(emphasis in original).  On the other hand, "limiting counsel to a percentage of the class's actual

recovery in a claims-made or reversionary fund situation is likely to disgorge significantly less

money overall, providing *defendants* with what might be characterized as a windfall.  All things

being equal, it seems more defensible that class attorneys, rather than defendants, receive the

excess, as they will likely reinvest it in future class action cases." Id. (emphasis in original). *See also* Gascho, 822 F.3d at 284 ("devaluing the available relief if it goes unclaimed could in many cases unduly penalize class counsel and have the lasting effect of discouraging the filing of class actions in cases where . . . the deterrent effect of such a suit would be socially desirable").

 As stated previously, the $733,000 sought by counsel, representing 25% of the full value of the settlement, is a "benchmark" figure. The fact that such an award would exceed the amount paid to the class is not by itself fatal to the request. *See* Torres, 519 Fed. App'x. at 3, in which the court approved "an award of $3,858,059.85 - comprising $3,415,450.00 in attorney's fees and $442,609.85 in costs - in connection with a $3,530,000 settlement on the eve of trial of class action claims". "Calculated on the basis of the total funds made available . . . the $3.86 million total award of costs and fees here represents 52.2% of the entire $7.39 million recovered by plaintiffs. Such an award does not constitute an abuse of discretion." Id., *5.

 However, while a benchmark figure may aid the court's analysis of the reasonableness of a fee request, it is no substitute for that analysis. *See* Goldberger v. Integrated Resources, Inc., 209 F.3d 43, 51–52 (2d Cir. 2000) ("[w]e are not unaware of the assumption that twenty-five percent is the 'benchmark' that district courts should award in common fund cases . . . .We are nonetheless disturbed by the essential notion of a benchmark . . . . [A] theoretical construct as flexible as a 'benchmark' seems to offer an all too tempting substitute for the searching assessment that should properly be performed in each case").

 Therefore, after considering the factors discussed above, "the court may always adjust the percentage awarded in order to come up with a fee it deems reasonable". Masters, 473 F.3d at 437. Moreover, "[e]ven when the percentage method is employed . . . the Second Circuit has endorsed the use of the lodestar method as a 'cross check' on the reasonableness of the

requested percentage." Davis, 827 F. Supp. 2d at 184; Masters, 473 F.3d at 436. "The lodestar

method multiplies hours reasonably expended against a reasonable hourly rate." Wal-Mart

Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 121 (2d Cir. 2005).

        As previously stated, I find the hours spent by counsel to be reasonable under the

circumstances. However, the same cannot be said for their hourly rate. Counsel argues that their

partner rates of $700/hour (Blankinship Declaration [128], ¶17) "are reasonable, indeed modest,

by comparison with other firms in the Southern District[ ]". Plaintiff's Memorandum of Law

[127], p. 30 of 34 and n. 13. However, the relevant district for purposes of the lodestar analysis

is the Western District of New York, not the Southern District. See Luciano v. Olsten Corp., 109

F.3d 111, 115 (2d Cir. 1997) ("[i]t is well-established that the 'prevailing community' the district

court should consider to determine the lodestar figure is the district in which the court sits"); In

re Bausch & Lomb, Inc. Securities Litigation, 183 F.R.D. 78, 83 (W.D.N.Y. 1998) (Larimer, J.).

        Although "[f]ees may be awarded at higher out-of-district rates if a reasonable

client would have selected out-of-district counsel because doing so would likely produce a

substantially better net result", Frommert v. Conkright, 2016 WL 7186489, *6 (W.D.N.Y. 2016)

(Larimer, J.), "[t]he party seeking a higher, out-of-district rate bears the burden of overcoming

the forum rule by making a particularized showing that objective factors warranted the use of

higher-priced, out-of-town counsel". Id. Counsel has made no such showing in this case, and

the cited hourly rates are far above what is reasonable in this district. See Frommert, *8 ("rates

in excess of $500 an hour . . . easily exceed what is typical for this district, and likely many other

districts as well"); Dunda v. Aetna Life Insurance Co., 2016 WL 4831962, *3 (W.D.N.Y. 2016)

(Telesca, J.) ("the rate of $600 requested by Plaintiff's counsel is excessive . . . . The Court finds

that an hourly rate of $320 is reasonable and appropriate here").

Multiplying the hours expended by a reasonable hourly rate for this district would yield a lodestar figure substantially lower than the $768,459.50 lodestar cited by counsel (plaintiff's Memorandum of Law [127], p. 30 of 34). However, "[c]ourts in their discretion may increase the lodestar by applying a multiplier based on factors such as the riskiness of the litigation and the quality of the attorneys". Wal-Mart Stores, 396 F.3d at 121. Therefore, even if the lodestar were cut in half to account for this district's lower hourly rates, a multiplier of at least two could be applied to that figure, restoring the fee award to the range sought by counsel. See Davis, 827 F. Supp. 2d at 185 ("[c]ourts regularly award lodestar multipliers from two to six times lodestar").

While counsel are to be commended for their overall handing of this case, in some respects their performance could stand improvement. See pp. 8, 12, 19, supra. Therefore, having considered all of the applicable factors, in the exercise of my discretion I will reduce their request for a $733,000 award for fees and expenses by five percent.

## CONCLUSION

For the foregoing reasons, plaintiff's Settlement Motion [123] is granted, and plaintiff's Fee Motion [126] is granted to the extent of awarding plaintiff the sum of $2,500.00 as a service award and plaintiff's counsel the sum of $696,350.00 as fees and expenses (both sums to be paid by First Niagara), but is otherwise denied.

Dated: December 29, 2016

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge